**OKLAHOMA CITY–ADA–ATOKA RAIL-WAY COMPANY, a corporation, Plaintiff in Error,**

**v.**

**Zettia Lurreline NICKELS, Defendant in Error.**

**No. 38037.**

Supreme Court of Oklahoma.

June 6, 1959.

Rehearing Denied Sept. 15, 1959.

Looney, Watts, Looney & Nichols, Oklahoma City, James D. Gibson, Muskogee, Alfred Stevenson, Holdenville, for plaintiff in error.

Gomer Smith, Jr., Charles Hill Johns, Anita Ellerbee, Oklahoma City, Roy Paul, Paul & Montgomery, Durant, for defendant in error.

HALLEY, Justice.

On June 12, 1953, Zettia Lurreline Nickels, surviving wife of Leaman Nickels, deceased, filed this action in the District Court of Coal County, against the Oklahoma City-Ada-Atoka Railway Company, to recover damages for the wrongful death of Leaman Nickels on June 20, 1951, at a point where the tracks of the railway company cross highways Nos. 69 and 75 slightly north and west of the City of Atoka. It was alleged by plaintiff that the death of her husband was the result of the negligence of the railway company in operating its train without proper warning to the deceased, as he drove his truck south along the highway toward the railway crossing. The case was tried before a jury and resulted in a verdict for plaintiff for $50,700, and defendant has appealed. We shall refer to the parties as they appeared in the trial court.

It was not disputed that Leaman Nickels was a man 34 years of age at the date of his death and had been a truck driver most of his mature years and was earning $54 per week at the time of his death, with a life expectancy of 36 years, and that on the date of his death he had left his home at Springfield, Missouri, at about 10 A.M. driving a White tractor with semi-trailer carrying a heavy load of more than 30,000 pounds of hogs in a southerly direction. On highway 69, where this highway crosses a bridge over Boggy Creek the railroad crossing is 854 feet to the south and this stretch of highway 69 is straight and practically level from the railroad crossing to the bridge over Boggy Creek, which is very little higher than the railroad crossing plainly visible in daylight or in the truck light approaching from the north as was plaintiff's decedent at about 9:55 P.M. when the accident occurred.

The approach of the defendant's train was in an easterly direction. The railroad from the west crossed Sandy Creek Bridge 930 feet west of the highway crossing. The train consisted of an engine, tender, two box cars and a caboose.

While the principal issue is whether the defendant was guilty of negligence that caused the collision, or whether the plaintiff's negligence caused or contributed to the collision, there is presented another question which we will dispose of before discussing the evidence in full.

When the plaintiff rested defendant demurred to the evidence. The demurrer was overruled and defendant granted an exception. At the close of all of the evidence defendant did not renew his demurrer, but did request that the court in-

struct the jury to return a verdict for the defendant, which was overruled. The plaintiff contends that the failure of defendant to renew his demurrer to the evidence denies the defendant the right to contend that the evidence is insufficient to support judgment for the plaintiff.

■ We recognize the well established rule that in a case tried to a jury where there is any competent evidence to support the finding of the jury a judgment based thereon will not be disturbed by this Court on appeal.

■ However, this Court has held many times that where a defendant demurs to the sufficiency of plaintiff's evidence and the demurrer is overruled, and defendant puts on his evidence and at the close of all the evidence does not renew his demurrer to the evidence, but requests the court to direct the jury to return a verdict for the defendant, he may still contend that the evidence is insufficient to support a judgment for the plaintiff.

This ruling is based upon the theory that a motion for a directed verdict is equivalent to a demurrer to the evidence and where one method is resorted to the other is not necessary. This rule is announced in Kizziar v. Pierce, 204 Okl. 51, 226 P.2d 941, 945, as follows:

"* * * The first special charge requested was that the court instruct the jury to return a verdict for defendant. Such special request was of the same effect as a motion for directed verdict, and presented the same question for the trial court's consideration as a demurrer to the evidence. J. R. Watkins Co. v. Palmer, 193 Okl. 684, 146 P.2d 843. * * *"

■ The same rule is announced in Bolon v. Smith, 170 Okl. 407, 40 P.2d 677; Marland Refining Co. v. Harrel, 167 Okl. 548, 31 P.2d 121, and numerous other cases. We conclude that the defendant was not precluded from contending that the evidence was insufficient to warrant any judgment for the plaintiff, by its failure to renew its demurrer at the close of all the evidence, but moved for a directed verdict at that time.

Defendant submits that the admitted physical facts, together with plaintiff's proof of the accident, including statements that the deceased never saw the train, and never applied his brakes, clearly shows that there was no "simultaneous" collision of plaintiff's decedent's truck and the train and that the deceased's injuries were not caused by defendant's failure to warn of any hazardous condition of the crossing where the collision occurred.

Plaintiff's first witness, Elroy Griffin, the driver of a truck loaded with milk, from McAlester south on highway No. 69, saw more of the accident than any other witness and had a full view of what happened just before and at the time of the accident. He testified that deceased had passed him twice on the drive along 69 north of the railroad crossing just north of Atoka. This witness was driving only about 200 yards behind the truck of the deceased when they crossed Muddy Boggy bridge at a speed of 40 to 50 miles per hour; that when he crossed that bridge they slowed down to perhaps 30 to 40 miles per hour; that there was a railroad crossing sign 352 feet north of the crossing; that when he was about half way from the bridge to the railroad crossing he heard the train whistle and saw the train coming from behind a clump of bushes; that he was in view of deceased's truck, which was less than 100 yards from the crossing when the train emerged from the bushes. This witness saw the deceased's truck hit the rear end of the first box car of the train and the front part of the second car. We quote a portion of his testimony as follows:

"Q. The engine had already crossed the highway? A. Yes, he hit the first car behind the engine.

"Q. Then one box car had crossed the highway; he hit the back end of the first car and the front end of the second car? A. Right.

"Q. He knocked the train loose, or broke the train, we will say? A. Yes, sir.

"Q. He hit the train with such force that the train stopped dead still right here? A. The train stopped there.

\* \* \* \* \* \*

"A. \* \* \* he first hit the back end of one car. \* \* \*

"Q. He had not even slowed down? A. I don't think he saw the train until he got right on it. That is how come him to swerve; he knew he was going to hit and could not stop.

"Q. The engine had gone across, the tender had gone across, and one big box car had gone across; and you say you don't think he saw it? A. Sure do."

This witness further testified that the only other warning sign than the one above mentioned was the railroad cross-arms sign some 4 or 5 feet north of the crossing, and that when he stopped his truck and went to the scene of the accident the front wheels of deceased's tractor were off the pavement to the right hand side or west of the highway; that he saw the train when deceased's truck was about 100 yards north of the crossing.

He further stated that when deceased's truck was about 10 yards from the train, the truck seemed to swerve to the right and into the center of the railroad sign; that when deceased's truck struck the train it broke the train, which stopped at once. He had heard the whistle and seen the lights of the train before he saw the train.

Deceased's employer Robert E. Stafford, testified as to the earnings of deceased and to the further fact that Leaman Nickels had made numerous trips to Atoka, possibly once a week or perhaps three times a week.

W. H Bailey, a member of the State Highway Patrol, investigated the accident here involved. He was familiar with No. 69 which was one of the highest traveled roads in southeastern Oklahoma, which runs north and south, while No. 75 comes into No. 69 from the west at Atoka; that there is a slight down-grade from the Boggy bridge which is about 825 feet north of the railroad track; that there is an island between the north and south prongs of 75 where it comes into 69, and is covered with some vegetation. He estimated that it would take about 200 feet to stop a truck and trailer with four axles traveling 40 miles an hour and carrying a gross load of 58,000 pounds; that there are trees about 180 feet west of the railroad crossing and even some closer on the day of the accident; that truck lights on bright would reflect from Boggy bridge to the railroad crossing and against a train or other object on the track; that there were no skidmarks on the pavement at the point of the accident.

The demurrer of defendant to the evidence of plaintiff was overruled and defendant then introduced its evidence.

Walter Kyle, who operated a filling station near the railroad·crossing and the highways, testified in part as follows:

"Q. Were you looking in the direction of the track when the train went across? A. Yes, sir.

"Q. Did you observe some lights north of the track? A. Yes, sir.

"Q. Did you later hear the impact of this truck and train? A. After the engine had went over."

The conductor on defendant's train testified that it consisted of the engine, tender, two box cars and a caboose, and that the truck hit "the oil pumps under the second car after knocking the steps off." The engine was 69 feet long and the first car 47 feet, 3 inches.

One brakeman testified that at the time of the impact the engine, tender and one box car had crossed the highway with the car still on the highway when the truck hit it.

Another brakeman, named Durbin who was riding on top of the second box car, testified in part:

"Q. At that time, can you tell where the truck was, in your best judgment? A. At that time the truck was between the south—in between the middle of the 'Y' and the bridge.

"Q. What happened then? A. I kept waving my lantern and hollering, still thinking the truck would stop.

"Q. At the time you were waving your lantern, was the engine whistling? A. I had to put my hands upon my face so the steam from the whistle there could not get on my glasses.

"Q. Then what happened? A. I kept waving the light and hollering; hollering would not do any good. The engine had gone across the crossing; I watched the truck still keep coming to about 15 feet of the crossing; the end of the first car—I saw he was not going to stop; I fell down on the car and grabbed hold with both hands. * *"

At the time of the collision it is not disputed that the train was moving only 10 to 15 miles per hour. Elroy Griffin also testified in part relative to where the train was when deceased struck it, as follows:

"Q. You saw the train coming and saw it when it entered the highway? A. Yes, sir.

"Q. When that engine entered the highway, according to your testimony— this truck was about 100 yards north? A. Yes, sir.

"Q. About 100 yards north? A. Approximately; it could be more or less.

* * * * * *

"Q. The engine went on the crossing when the truck was about even with the sign on the highway—250 feet north of that crossing? A. What sign was that?

"Q. I don't know—one east of the highway. The engine went on the crossing when the truck was about even with the sign on the east of the highway, 150 to 200 feet north of the crossing? A. Of the railroad sign?

"Q. I am just asking just what you said that night. A. I don't know; I won't commit myself on that. I don't know what sign you are talking about.

"Q. Calling your attention to plaintiff's Exhibit 6, can you see that sign right there; is that what you had in mind when you were talking about it;

just the other side of the car? A. It is possible.

"Q. That is between the two outlets of 75, is it? A. Yes. When I saw the train, the train was here on this railroad crossing where it appears."

This witness marked on plaintiff's Exhibit No. 6 the exact point where deceased's truck was when the train entered the crossing at 211 feet from the crossing and deceased could have stopped his truck before striking the train according to the testimony of the highway patrolman, had the truck driver been alert and watching the highway. Defendant's engineer testified that the headlight on the engine shone ahead for 1500 feet and well beyond the right of way of the highways. The railroad is straight from beyond Big Sandy Creek to the west and the highway being traveled by the truck of deceased was perfectly straight from the Big Muddy bridge to the north of the railroad crossing.

The sheriff of Atoka County was at a filling station some 600 or 700 feet south of the railroad crossing. He heard the train whistle and saw the lights. He also saw some lights of cars coming down the highway from the north. He also heard the train.

It is not denied that the engine of defendant's train was properly equipped with a good headlight; that the whistle was blown near or beyond Sandy Creek Bridge; that the bell was rung. Plaintiff's own witness who saw the accident while driving behind the truck of plaintiff's decedent, testified that he heard the train whistle and saw its headlight before it reached the highway crossing. The admitted facts as to where the collision occurred is ample proof that the train was over the crossing when the deceased drove his truck into the box cars.

■ We think that where a train is occupying a highway crossing it is sufficient to notify those traveling the highway that it is blocked by the train and it is immaterial whether it was moving or standing still. Especially is this so in Oklahoma since it is

provided by 47 O.S.1951 § 121.3 that one driving a motor vehicle upon our highways must drive at such speed as will enable him to stop within the clear distance ahead. In the recent case of Kansas, Oklahoma & Gulf Railway Co. v. Painter, Okl., 333 P.2d 547, 548, the latter rule is announced in the second paragraph of the syllabus as follows:

"Ordinarily, the presence of a train or railway cars on a crossing, whether moving or stationary, is sufficient notice to a driver of a vehicle on the highway of such obstruction and, in the absence of unusual circumstances, the operating railway company is not under any duty to provide any other notice or warning."

In that case we followed Cain v. St. Louis-San Francisco Railroad Company, Okl., 293 P.2d 355; Thompson v. Carter, 192 Okl. 579, 137 P.2d 956; Raley v. Thompson, 203 Okl. 633, 225 P.2d 171; Atchison, T. & S. F. Ry. Co. v. Templar, 204 Okl. 460, 230 P.2d 907.

■ The evidence in the case before us clearly establishes the fact that the train entered the crossing first and was moving slowly across the railway crossing when plaintiff's decedent drove his truck into the first and second car of the train, at such speed as to crush the engine of the truck and derail some wheels of the box cars. We have examined all of the testimony and exhibits and can find no competent evidence tending to prove that the defendant was guilty of negligence that caused or contributed to the injuries suffered by the plaintiff's decedent. There were no unusual circumstances which necessitated any additional warning to let the driver of the truck know of the presence of the train upon the crossing.

The plaintiff relies on the case of Chicago, R. I. & P. R. Co. v. Richerson, 185 Okl. 560, 94 P.2d 934, but that case is distinguishable from the case at bar in that there it was denied that the train occupied the crossing and there was testimony that no whistle was blown or bell rung and it was admitted there was no crossing sign.

We find it unnecessary to discuss the various propositions of defendant questioning the court's instructions since we have found it necessary to reverse the judgment upon other grounds.

The judgment is reversed and remanded with directions to render judgment for the defendant.

DAVISON, C. J., and WELCH, JACKSON, IRWIN and BERRY, JJ., concur.

WILLIAMS, V. C. J., and JOHNSON, J., dissent.